700 F.2d 1
 12 Fed. R. Evid. Serv. 545
 UNITED STATES of America, Appellee,
v.
Jack SOUTHARD, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Monsour FERRIS, a/k/a Monte, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Lester BANKER, a/k/a Lem, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
John BRIAN, a/k/a John Baborian, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Anna QUINTERNO, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Vincent QUINTERNO, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Harry KACHOUGIAN, a/k/a Tom and Tommy, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Robert MARTIN, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Bernard FALK, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Anthony LAURO, a/k/a Poochie, Defendant, Appellant.
 Nos. 82-1013 to 82-1019 and 82-1130 to 82-1332.
 United States Court of Appeals,
First Circuit.
 Argued Oct. 4, 1982.
Decided Jan. 28, 1983.
Rehearing Denied in Nos. 82-1014, 82-1016, 82-1019 March 30, 1983.
 
 Morris M. Goldings, Boston, Mass., with whom Richard S. Jacobs, Mahoney, Hawkes & Goldings, Boston, Mass., and Matthew J. Zito, North Providence, R.I., were on brief, for defendants, appellants Jack Southard and Lester Banker.
 Bruce A. Assad, Fall River, Mass., for defendant, appellant Monsour Ferris.
 John Tramonti, Jr., Providence, R.I., for defendant, appellant John Brian.
 Aram K. Berberian, Warwick, R.I., with whom Michael J. Kiselica, Providence, R.I., was on brief, for defendant, appellant Harry L. Kachougian.
 William G. Hundley, Washington, D.C., with whom Larry S. Gondelman, and Hundley & Cacheris, P.C., Washington, D.C., were on brief, for defendant, appellant Robert L. Martin.
 Ralph J. Gonnella, Providence, R.I., for defendant, appellant Anthony Lauro.
 Patty Merkamp Stemler, Atty., Dept. of Justice, Washington, D.C., with whom Lincoln C. Almond, U.S. Atty., and Edwin J. Gale, Sp. Atty., Providence, R.I., were on brief, for appellee.
 Before COFFIN, Chief Judge, PECK,* Senior Circuit Judge, and BOWNES, Circuit Judge.
 BOWNES, Circuit Judge.
 
 
 1
 These appeals arise from a series of cases tried in the District Court of Rhode Island. Defendants-appellants, along with six others, were charged in a thirteen-count indictment with violations of federal gambling statutes, 18 U.S.C. Sec. 1955 and 18 U.S.C. Sec. 1084(a). There were also aiding and abetting charges, 18 U.S.C. Sec. 2, and a conspiracy count, 18 U.S.C. Sec. 371.
 
 
 2
 The indictment was based on court-authorized wiretaps of the telephones of appellants Brian and Kachougian. The affidavit supporting the authorization rested on statements made to the affiant by undisclosed informants. At trial, intercepts of a number of telephone conversations were introduced. They can be described as follows: conversations between Brian and Kachougian; conversations between Brian and the other appellants; conversations between Brian and persons not indicted; and conversations between Kachougian and persons not indicted. Material seized from the homes of Brian and Kachougian pursuant to a search warrant was also part of the government's evidence.
 
 
 3
 Brian, who was the central figure in the case, was charged in every count of the indictment. The other appellants were each named in one or two counts. In response to severance motions the court scheduled five separate trials. Brian was named as a defendant in each trial along with certain of the other appellants. Prior to the start of the first scheduled trial, a number of the defendants stipulated to the facts of the offense(s) charged, reserving their right to appeal the court's rulings on pretrial motions. Defendants Brian, Kachougian, Anna Quintero, Vincent Quintero, Martin, and Falk all stipulated; they were all convicted following brief bench trials. Defendants Banker, Ferris, and Southard were convicted after three separate jury trials. Banker and Ferris were tried alone. Southard was tried with Dominic Buzzaco and Louis Gori, both of whom were acquitted. Defendant Lauro was convicted after a full-fledged bench trial.
 
 The Common Issues
 
 4
 We think it helpful to state at the outset those issues raised by more than one appellant, which appellants raise the issue and their place in the opinion. These issues are:1. Whether the district court erred in not granting an adversarial hearing under the doctrine of Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), on the challenge to the truthfulness of the affidavit given in support of the application for the wiretaps. This issue is raised by all appellants and is discussed first.
 
 
 5
 2. Whether the indictment was defective because it charged both a substantive violation of 18 U.S.C. Sec. 1084(a) and a violation of the aiding and abetting statute, 18 U.S.C. Sec. 2. This issue is raised by Banker, Ferris, and Southard and is discussed as part of our review of Southard's case.
 
 
 6
 3. Whether the admission of evidence to show the scope of Brian's gambling activities was error. Southard, Ferris, and Banker raised this issue; it is discussed in our review of Ferris' case.
 
 
 7
 4. Whether there was a misjoinder of certain defendants. Martin and Southard raised this issue; it is discussed in our review of Martin's case.
 
 
 8
 Our findings and rulings on these issues apply to all appellants. Issues raised by only one appellant will be examined in our review of that appellant's case.
 
 THE FRANKS HEARING ISSUE
 
 9
 All defendants challenged the affidavit submitted by F.B.I. Agent Conley and relied on by the magistrate in authorizing the electronic surveillance of the telephone of Brian and Kachougian. This affidavit summarized the information supplied to Conley and other law enforcement officials by five unnamed informants. In addition to the information provided by the confidential informants, the affidavit contained certain documentary evidence: the telephone company billing records of the three phone numbers allegedly used in Brian's and Kachougian's gambling business, and the criminal records of certain of the suspected gamblers, including Brian. The affidavit also stated that local police surveillance verified that on twenty-three days Brian was present at the location of one of the phone numbers allegedly used to place and accept bets.
 
 
 10
 On its face, the affidavit submitted by Conley was sufficient to establish probable cause to believe that various individuals were conducting a gambling business in violation of federal gambling statutes. According to the affidavit, certain of the informants admitted placing bets with Brian's gambling operation--either directly with Brian, or with one of Brian's bookmakers. Two informants provided telephone numbers at which either Brian or Kachougian could be reached for placing bets. Further, Conley provided sufficient background information about the informants to show that their information in this particular case was accurate and that they had proved to be reliable in the past.[1] See Spinelli v. United States, 393 U.S. 410, 415, 89 S.Ct. 584, 588, 21 L.Ed.2d 637 (1969); Aguilar v. Texas, 378 U.S. 108, 114-15, 84 S.Ct. 1509, 1513-1514, 12 L.Ed.2d 723 (1964).
 
 
 11
 The Conley affidavit, like all facially valid affidavits supporting a wiretap authorization, bears a presumption of validity. This initial presumption, however, will not shield the affidavit from closer scrutiny when there is reason to doubt the veracity of the affiant. As the Supreme Court explained in Franks v. Delaware,a flat ban on impeachment of veracity could denude the probable-cause requirement of all real meaning. The requirement that a warrant not issue "but upon probable cause, supported by Oath or affirmation," would be reduced to a nullity if a police officer was able to use deliberately falsified allegations to demonstrate probable cause, and, having misled the magistrate, then was able to remain confident that the ploy was worthwhile.
 
 
 12
 Franks v. Delaware, 438 U.S. 154, 168, 98 S.Ct. 2674, 2682, 57 L.Ed.2d 667 (1978).
 
 
 13
 Not every challenge to an affiant's veracity will lead to an evidentiary hearing, however. Franks requires that a defendant make a "substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and ... is necessary to the finding of probable cause" before an evidentiary hearing (a "Franks" hearing) must be conducted. Id. 438 U.S. at 155-56, 98 S.Ct. at 2676-77. The prerequisites for a Franks hearing have been clearly articulated:
 
 
 14
 To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits of sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant. Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required.
 
 
 15
 Id. at 171-72, 98 S.Ct. at 2684-2685 (footnote omitted).
 
 
 16
 Appellants filed six affidavits which challenged the veracity of Conley's affidavit on a number of grounds. First, they alleged that the two undisclosed informants who purportedly placed or accepted bets with Brian over the telephone could not exist, since transcripts of the subsequent wiretaps revealed no unidentified callers. It followed, they contended, that none of the informants could have called during the intercepts. Because the absence of informant calls was inconsistent with statements made in the affidavit, defendants concluded that Conley falsified his affidavit.
 
 
 17
 The government presented the district court with a list of forty-eight telephone conversations containing unidentified voices on the three tapped telephones. Appellants reviewed the transcripts of calls from two of the tapped telephones, determined that there were only four[2] unidentified callers, and then advanced the totally unsupported claim that all four of these telephone calls were from the same person. Appellants concluded from this that there could have been, at most, only one informant. Appellants further challenged the government's tally of forty-eight unidentified voices by pointing out that some of these voices appeared on the transcripts of outgoing telephone calls (i.e., telephone calls originating from one of the tapped telephones) and were, therefore, unidentified "receivers" rather than "callers." Appellants seem to be arguing that these unidentified receivers could not possibly have been the informants relied on by Conley. This argument is flawed. It is entirely possible that Brian was in the habit of calling certain of his regular gambling customers to see if they wanted to bet with him. Any of these unidentified receivers could have been one of Conley's unidentified informants.[3]
 
 
 18
 The district court below reviewed the wiretap transcripts which are now before this court. Additionally, it conducted an in camera interview of Conley at which he represented that there were several unidentified voices on the taps. On the basis of this evidence the district court concluded that there were indeed unidentified callers. Our review convinces us that the district court's finding was fully supported by the evidence.
 
 
 19
 The second challenge to Conley's affidavit was the claim that it contained certain concrete misstatements. Jack Toumasian, custodian of the Armenian Club in Providence, stated in an affidavit that there had never been a telephone in the club during the past five years. Charles Garabedian filed an affidavit in which he said that throughout the relevant time period he never resided at Whipple Street, as stated in the Conley affidavit. The most these two affidavits indicate is that the Conley affidavit was not free of all misstatements. Even if we assume that these particular misstatements were knowing and intentional--a large assumption[4]--they are irrelevant to the finding of probable cause. The Conley affidavit, even if shorn of all mention of the Armenian Club and Garabedian's address, would still, on its face, support a finding of probable cause. To warrant a Franks hearing, the false statement must be necessary to the finding of probable cause. Franks v. Delaware, 438 U.S. at 156, 98 S.Ct. at 2676.
 
 
 20
 Appellants further challenged Conley's veracity on the ground that it was shown to be questionable in a Franks hearing held in connection with the search of appellant Southard and his automobile. In issuing the search warrant, the magistrate relied upon an affidavit submitted by Conley, in which he summarized a conversation between appellants Brian and Southard. Southard alleged certain material misrepresentations in Conley's reporting of the conversation. After reviewing both the transcript of the conversation and Conley's summary, the district court found certain discrepancies which it felt evidenced a reckless disregard for the true contents of the crucial conversation. Although the district court expressly did not find that Conley "deliberately lied or engaged in willful and wanton misconduct rooted in bad faith," it nonetheless suppressed all evidence which resulted from the search.
 
 
 21
 The fact that Conley submitted a tainted affidavit in connection with a related case casts a certain degree of doubt upon his credibility as an affiant.[5] Determinations of credibility, however, are matters within the discretion of the district court. The result of the Franks hearing on the Southard search warrant is only one piece of evidence bearing upon Conley's credibility. It proves nothing about the veracity of the affidavit at issue in this case and standing alone cannot establish appellants' right to a Franks hearing.
 
 
 22
 Appellants' most serious challenge to the Conley affidavit is contained in the Brian, Baborian and Garabedian affidavits in which they deny having made any of the statements attributed to them by the unidentified informants. These general denials are subject to two interpretations. One, as the government urges, is that the affidavit contains untrue statements because the informants themselves lied to Conley when they reported the actions and conversations of Brian and others. Viewed in this light, the appellants' affidavits challenge only the veracity of the informants, not of Conley. Franks' requirements cannot be satisfied by a showing that an informer lied to an unsuspecting affiant, even when the lie was deliberate. United States v. Schauble, 647 F.2d 113, 117 (10th Cir.1981).
 
 
 23
 The other interpretation, which is the one adopted by appellants, is that they negate the very existence of unidentified informants. If there were no informants, then Conley made "a false statement knowingly and intentionally," one of the requirements for a Franks hearing. Franks v. Delaware, 438 U.S. at 155, 98 S.Ct. at 2676. Further, if there were no informants, then the affidavit fails to establish probable cause for the authorization of a wiretap. If the statements purportedly supplied by the informants are excluded, the affidavit does little more than establish that three telephones were used extensively, and that Brian was often present at the location of one of these telephones--hardly a convincing showing of probable cause. Thus, the other Franks prerequisite, that the false statement be necessary for a finding of probable cause, is satisfied.
 
 
 24
 Even though appellants alleged that the affidavit contained an intentionally false statement, attributable to Conley rather than to any informant, and necessary to the magistrate's finding of probable cause, they have failed to make the "substantial preliminary showing" required by Franks. All of appellants' allegations are conclusory and unsupported by any offer of proof. By denying flatly that they ever engaged in gambling-related conversations, Brian, Baborian and Garabedian set up a swearing contest; either they or Conley are lying. Appellants' denials, however, do not demonstrate a substantial possibility of affiant perjury.[6] The district court determined that appellants' affidavits did not meet the "substantial preliminary showing" required by Franks. This finding was not clearly erroneous and must be affirmed. See United States v. Cruz, 594 F.2d 268, 272 (1st Cir.), cert. denied, 444 U.S. 898, 100 S.Ct. 205, 62 L.Ed.2d 133.
 
 
 25
 This, however, does not conclude our review of the matter. Appellants claim that the court committed reversible error in conducting an ex parte, in camera interview of Agent Conley; they argue that under Franks a veracity determination can only be made after an adversarial hearing. Appellants miss the point; the in camera interview was held to determine if an adversarial hearing would be necessary. The court recognized that it was faced with a different situation than that presented in Franks where the witnesses were named in the affidavit and the defendants had an opportunity to investigate and interview them on the question of the affiant's veracity. In addition to the motions for a Franks hearing, defendants had also filed motions for production of the informants and the government's informant files. Obviously an adversarial hearing would be useless to defendants unless they had an opportunity to question the informants or, at least, obtain some information about them. The court felt that it could best protect the fourth amendment rights of defendants while keeping the identity of the informants secret by an ex parte, in camera proceeding. It reasoned as follows:
 
 
 26
 [I]n a case where--because the Government's affidavit relies primarily on the use of confidential informants--defendants lack the very information that Franks requires for a threshold showing; where defendants deny, via affidavit, specific facts attributed to them by informants; and where defendants make some minimal showing of inconsistency on the face of the government's material which supports their assertion of deliberate falsehood or reckless disregard for the truth, the Court may, and probably should, conduct an in camera interview of the affiant, and, if necessary, of the informants relied upon by the Government. This requirement will insure that, in a situation where no other means are present and where it is unclear whether the Government will call its informants at trial, defendants have some measure of protection from Governmental perjury and misstatement.
 
 
 27
 United States v. Brian, 507 F.Supp. at 766.
 
 
 28
 Ex parte, in camera hearings have been used by three other courts to determine the necessity of conducting a full Franks hearing. In a case similar to this one, the Fifth Circuit approved the district court's refusal to order disclosure of an informant's identity. The district court had questioned in camera the officer to whom the informant had reported so as to assure itself of the officer's veracity. United States v. Arrington, 618 F.2d 1119, 1125-26 (5th Cir.1980), cert. denied, 449 U.S. 1086, 101 S.Ct. 876, 66 L.Ed.2d 812 (1981). In United States v. Licavoli, 604 F.2d 613, 621 (9th Cir.1979), cert. denied, 446 U.S. 935, 100 S.Ct. 2151, 64 L.Ed.2d 787 (1980), the district court had questioned in camera a confidential informant to determine whether the defendant had made a substantial showing of governmental misrepresentation. United States v. House, 604 F.2d 1135 (8th Cir.1979), cert. denied, 445 U.S. 931, 100 S.Ct. 1320, 63 L.Ed.2d 764 (1980), presents a variation. The district court examined the sealed statement of the confidential informant in which his name had been blacked out. This statement was prepared by the informant after the execution of the search warrant. Defendants challenged this procedure, arguing that an in camera examination of the informant was required. The Eighth Circuit disagreed, stating that when the veracity of an affiant was at issue, "the trial court had only to determine whether there was an informant; the identity of the informant was irrelevant." Id. at 1140.
 
 
 29
 Ex parte, in camera hearings are part of a trial judge's procedural arsenal but, of course, should only be used when necessary. We do not fault the district court here for holding such a hearing. Under the circumstances prevailing at this point in the proceedings, it was well within the court's discretion to interview Conley ex parte, in camera.
 
 
 30
 There is, however, one aspect of the in camera interview that is troubling; no record was made of it. If it were not for the fact that the district court here issued a written report of the interview,[7] appellate review would have been completely nullified. In light of this report, set forth in its entirety in the margin,[8] we hold that the failure of the district court to have a record made of the in camera interview was harmless error. We emphasize, however, that in camera hearings should be recorded. Such hearings play an important role in trial proceedings and it is necessary that they be subject to the same appellate scrutiny and review as all other aspects of pretrial and trial proceedings. This is not possible without a record.
 
 
 31
 The district court's denial of a Franks hearing is affirmed.
 
 FERRIS
 
 32
 There is one issue Ferris raises that also applies to Banker and Southard: whether evidence introduced to show that Brian was in the gambling business was properly admissible. Additionally, there are three issues indigenous to the Ferris case: the sufficiency of the evidence; whether a jury instruction was erroneous; and the use of an interrogatory verdict form.
 
 
 33
 Ferris was charged with violating 18 U.S.C. Sec. 1084(a) and of aiding and abetting its violation.[9] He was found not guilty of the substantive violation and guilty of aiding and abetting. An aiding and abetting conviction requires proof beyond a reasonable doubt that a crime was committed and "that appellant willfully associated himself in some way with the criminal venture and willfully participated in it as he would in something he worked to bring about." United States v. Indelicato, 611 F.2d 376, 385 (1st Cir.1979) (citation omitted); see also Nye & Nissen v. United States, 336 U.S. 613, 619, 69 S.Ct. 766, 769, 93 L.Ed. 919 (1949); United States v. Hathaway, 534 F.2d 386, 399 (1st Cir.), cert. denied, 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976). To meet its burden of proof, the government therefore had to prove that codefendant Brian was in the business of betting or wagering,[10] that defendant knew it and participated in it.I. The Admissibility of the Evidence of Brian's Gambling Activities
 
 
 34
 There were two exhibits to which defendant objected. Exhibit 2 consisted of documents seized at the home of appellant Kachougian; the documents contained records of bets on the outcome of sporting events. Exhibit 4 was a tape of three telephone conversations between Brian and Kachougian. If believed, the evidence showed rather conclusively that Brian and Kachougian operated a gambling business. Defendant was not named in either exhibit.
 
 
 35
 Defendant argues that the evidence was inadmissible for two reasons, that it was hearsay and unduly prejudicial. The hearsay contention is easily disposed of. Before Exhibit 2 was introduced, the court carefully explained to the jury that it was being admitted only to show the scope of Brian's gambling operations and not for the truth of the specific statements contained in the various documents. This instruction was repeated before Exhibit 4 was admitted. So limited, the exhibits are not hearsay. Federal Rule of Evidence 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." The records and telephone conversations were verbal acts offered only to prove that bets had been recorded and betting conversations had taken place. See United States v. Boyd, 566 F.2d 929, 937 (5th Cir.1978); United States v. Martorano, 561 F.2d 406, 407 (1st Cir.1977), cert. denied, 435 U.S. 922, 98 S.Ct. 1484, 55 L.Ed.2d 515 (1978); United States v. Sharpe, 452 F.2d 1117, 1120 (1st Cir.1971). This also disposes of defendant's claim that the jury instruction on the Brian-Kachougian documents and telephone intercepts was erroneous; the instruction was essentially a repeat of what had been given during the trial. For the same reason, defendant's argument that the evidence was inadmissible because he was not charged with conspiracy is far off target. The evidence was not admitted under Federal Rule of Evidence 801(d)(2)(E) as a "statement by a coconspirator of a party during the course and in furtherance of the conspiracy." It was admitted properly as nonhearsay verbal acts.
 
 
 36
 The next question is whether the prejudicial effect of the evidence on the defendant required its exclusion. We start with Federal Rule of Evidence 403 which provides in relevant part: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury ...." A district court's determination of admissibility under this rule is reviewable only for abuse of discretion. United States v. Gonsalves, 668 F.2d 73, 75 (1st Cir.), cert. denied, 456 U.S. 909, 102 S.Ct. 1759, 72 L.Ed.2d 168 (1982). The record is clear that the district court carefully weighed the probative value of the evidence against the danger of unfair prejudice.
 
 
 37
 Defendant's argument focuses on the spillover effect of the evidence, i.e., because of the extent of Brian's gambling activities, the jury must have inferred that defendant knew about them. We do not blink our eyes to the possibility that some prejudice inured to the defendant, but the court's limiting instruction, given thrice, restricted any prejudice to a minimum. The government first had to prove that Brian was in the gambling business. The best and simplest way was by introducing documents seized from Brian's house and the home of Kachougian, the other person with whom he operated, and transcripts of telephone calls between them. The district court did not abuse its discretion in determining that the probative value of this evidence was not "substantially outweighed by the danger of unfair prejudice." Fed.R.Evid. 403. The evidence was properly admitted.
 
 II. The Sufficiency of the Evidence
 
 38
 Because none of the evidence discussed supra directly implicated defendant, the critical question is whether the other evidence was sufficient for a finding that defendant knew Brian was in the business of betting. The tapes of seven telephone conversations between defendant and Brian on December 9, 11, and 12, 1977, were introduced.[11] Their content can be summarized as follows. In the first call Brian asked defendant if the "guy" he beat in football had settled up. Defendant replied that Sunday or Monday were the days. Brian asked defendant to ask the bookmaker (one that defendant had been using) to get a line for the game that night and then asked him to confirm the settle-up date. Defendant was asked if the bookmaker took horse bets and replied that he did not know, but he had another guy that would take such bets. Brian then gave defendant the names of two horses for him to put bets on. The next call was made fourteen minutes later on the same day. Defendant said he couldn't contact the person through whom he wanted to place the horse bets, but said he would get in touch with somebody else. Brian then repeated the horse race bets specified in the first call. Defendant then gave Brian the first name (Dave) of a bookmaker and his telephone number. Brian said that he would rather have defendant call the bookmaker. Defendant then asked Brian how much to bet on the horses and Brian told him $200 to win and place on both horses. The third call was from defendant to Brian ten minutes later. Defendant confirmed that he placed the bets and there was some discussion of the odds. The fourth call was about six hours later from Brian to defendant. Brian gave defendant the results of the horse race, one horse finished second and the other did not place. The call ended with a reference to a football game. Brian said he "liked" Dallas over San Francisco but wasn't going to "play" the game. The fifth call was on a different date (three days earlier). Brian asked defendant if he had a new bookmaker to call. Brian told defendant that he wanted to bet on the New Orleans Jazz plus eight points. Brian also said that he would take Wisconsin plus nine points against Providence. (Both references are to basketball games, one professional and one college.) The sixth call on a different day was from defendant to Brian. Brian asked what the odds were on the Patriots (a professional football team). Defendant stated that the bookmaker had them at three and one-half points. Brian indicated that defendant was to bet as much as he could on the game. Defendant then read a list of other professional football games and the odds on each. Brian said he was only interested in the Patriots' game. The seventh and final call followed the prior call by ten minutes. Defendant told Brian that he had placed a bet for him on the Patriots in the amount of $3,000.
 
 
 39
 Defendant contends that the most the telephone calls prove is that he placed one bet for Brian with another bookmaker in the amount of $3,000 and shared bets on two horses. This, defendant argues, was insufficient to prove that he knew Brian was in the gambling business.
 
 
 40
 We must evaluate the evidence in the light most favorable to the government, including all legitimate inferences to be drawn from it. United States v. Winter, 663 F.2d 1120, 1127 (1st Cir.1981), cert. denied --- U.S. ---, 103 S.Ct. 1250, 75 L.Ed.2d 479 (1983). It is not only the results of the telephone calls that count, but what can be inferred from the tenor of the conversations. The intercepts showed that defendant and Brian were well acquainted and spoke a common gambling language. The telephone calls discussed betting on horse racing, football, and basketball. Moreover, according to defendant's own testimony, he had known Brian for between thirty-five and forty years and had seen him at least two or three times a week in recent years. The odds weigh heavily against defendant's contention that he did not know that Brian gambled as a business, not as a pastime. We think the evidence was sufficient to sustain a jury finding that defendant knew that Brian was in the gambling business.
 
 
 41
 Once it was found that defendant knew Brian was in the gambling business, it almost necessarily followed that defendant was an aider and abettor. At Brian's request, defendant placed a substantial bet ($3,000) on a football game with a bookmaker for Brian. Defendant contends that he was only doing a favor for a friend. But the friend was a professional gambler and whatever the motive, defendant knowingly helped him carry on his illegal activity. The fact that only one bet was placed is not, as defendant suggests, an exoneration. Although "one swallow does not a summer make," in this context one bet can suffice for a finding of aiding and abetting.
 
 III. The Jury Instruction
 
 42
 Defendant advances as error part of the instruction on aiding and abetting. He focuses on the following words: "and in this case it's necessary that you find Mr. Ferris willfully assisted himself with the criminal venture, that is, the criminal venture of Mr. Brian in the business of betting and wagering." (emphasis added) Defendant argues that by using these words the district court "effectively presented the government's evidence on this issue as indisputable thereby severely prejudicing Ferris." Brief for Defendant at 35. The answer to this contention is twofold: the instruction read in its entirety did not present the evidence as indisputable, and defense counsel did not object to this part of the charge.
 
 
 43
 Defendant concedes that because of his failure to object to the instruction he is barred under Federal Rule of Criminal Procedure 30 from assigning it as error, but argues that the language used constituted plain error under Federal Rule of Criminal Procedure 52(b). We find no error, plain or otherwise. Defendant ignores entirely the first part of this instruction in which the court carefully instructed the jury that before it reached the question of aiding and abetting it first had to determine whether Brian was in the business of betting or wagering.[12] The words on which the defendant relies have been lifted entirely out of context; they were given in that part of the instruction pertaining to defendant's actions, not those of Brian.[13] The instruction was not erroneous either in part or in whole.
 
 IV. The Jury Verdict
 
 44
 As already noted, defendant was charged with violating 18 U.S.C. Sec. 1084(a) and for aiding and abetting its violation. A jury verdict interrogatory form was submitted to the jury, asking it to answer two questions:
 
 
 45
 1. Do you find the defendant guilty or not guilty of violating 18 U.S.C. Sec. 1084--that is, of engaging in the business of betting and wagering as recited in the statute which the Court has read to you and on which you have been instructed?
 
 
 
 You answer Question No. 2 only if you find the defendant not guilty of the offense as set forth in Question No. 1 above.
 
 
 
 46
 2. Do you find the defendant guilty or not guilty of aiding and abetting in violation of 18 U.S.C. Sec. 1084--that is of engaging in the business of betting and wagering as recited in the statute which the Court has read to you and on which you have been instructed?
 
 
 47
 Defendant contends that the use of the interrogatory form violated Federal Rule of Criminal Procedure 31[14] and that special interrogatories are improper and constitute plain error in a criminal case.
 
 
 48
 We first point out that there was no violation of Rule 31.[15] The verdict was returned by the jury to the judge in open court. It was unanimous; the court upon its own motion polled the jury.
 
 
 49
 The question of plain error is more difficult. In United States v. Spock, 416 F.2d 165 (1st Cir.1969), we condemned the use of special jury questions in a criminal case, pointing out that "not only must the jury be free from direct control in its verdict, but it must be free from judicial pressure, both contemporaneous and subsequent." Id. at 181 (citations omitted). We also voiced concern about the effect that answering special questions might have on the jury's ultimate conclusions: "There is no easier way to reach, and perhaps force, a verdict of guilty than to approach it step by step." Id. at 182. But cf. Heald v. Mullaney, 505 F.2d 1241, 1246 (1st Cir.1974) (in a habeas corpus case the requirement of special findings if jury found defendant not guilty was held not to be an error of constitutional dimensions), cert. denied, 420 U.S. 955, 95 S.Ct. 1339, 43 L.Ed.2d 432 (1975).
 
 
 50
 If the defendant had objected to the use of the verdict form, we might be inclined to view its use as plain error.[16] But there was no objection when the court informed the jury that this type of form would be submitted to it. Although there is no record of the pre-argument discussion of the charge, the record does show that such a discussion was held and, presumably, the use of the verdict form was discussed with counsel at that time. After the charge, counsel were asked to examine the verdict "sheet" to see if it was satisfactory; defense counsel stated explicitly that the form was "satisfactory to defendant." Defense counsel not only failed to object to the use of the form, he gave it his stamp of approval. The only question, therefore, is whether the use of the form amounted to plain error under Federal Rule of Criminal Procedure 52(b).[17] We think not. In Spock ten special questions were put to the jury. Here, there were only two. This reduced to a minimum the "step by step" process of determination of guilt which we pointed out in Spock could result from the use of special jury questions. Although it was error to put the two questions to the jury, the error was nullified by defense counsel's failure to object and his explicit approval of the form.
 
 
 51
 The conviction is affirmed.
 
 MARTIN
 
 52
 We consider two issues: whether a stipulation of facts entered into between defendant and the government should be vacated and the case remanded for a new trial; and whether joinder of Martin with another defendant, Banker, under Federal Rule of Criminal Procedure 8(b) was improper.
 
 
 53
 The facts underlying the issues are important. Martin was indicted along with sixteen others in a thirteen-count indictment for violations of federal gambling laws. He was named and charged solely in Count IV for violating 18 U.S.C. Sec. 1084. Codefendant John Brian, who was charged in all thirteen counts, was the only other defendant named and charged in Count IV. The district court, faced with a number of severance motions, scheduled five separate trials for the defendants. Martin was scheduled to be tried on Count IV with Brian and with defendant Banker who, along with Brian, was to be tried on Count V. Prior to trial, Martin entered into a stipulation of facts with the government which admitted the essential elements of the offense and reserved his rights to appellate review of issues raised by pretrial motions. The district court found Martin guilty on the basis of the stipulated facts and the legal conclusions drawn therefrom. At the sentencing hearing the government recommended that Martin be imprisoned for eighteen months and fined $10,000. This was the sentence imposed. The maximum penalty under the statute is imprisonment for not more than two years and a fine of not more than $10,000.
 
 I. The Stipulation Issue
 
 54
 Defendant argues that the government breached the agreement that induced him to enter into the stipulation and therefore it should be vacated. This raises two questions: one factual--whether the terms of the pretrial stipulation agreement were breached, and one legal--whether the stipulation should be treated as a guilty plea.
 
 
 55
 We turn first to the alleged agreement, which was at most an oral understanding, not a formal written agreement. We accept defendant's statement that "the government was looking for people to come in and plead in order to help resolve the problem of conducting several trials back to back." Brief for Defendant at 3. Our acceptance is not based on any record evidence, there was none--only the representations of defense counsel--but on the assumption that this is normal and perfectly proper governmental procedure in any multidefendant case. In any event, Martin appears to have been the first to come forward and suggest that a trial might be avoided.
 
 
 56
 It is not disputed that the government consistently took the position that its recommendation would include "some" jail time. Defendant's breach of agreement argument hinges on the claim that the word "some" meant considerably less than the maximum penalty of two years. This understanding was derived from statements by the prosecutor to the effect that: "You broke the roadblock, we appreciate that. We think that Mr. Martin should get some benefit from that." Brief for Defendant at 3. The government does not deny that statements of this tenor were made, but says it lived up to any agreement or understanding that they might have implied by recommending eighteen months imprisonment instead of the maximum term of two years.
 
 
 57
 We have searched the record in vain for any evidence pointing to a definite agreement by the government to make a specific recommendation of the term of imprisonment. Defendant knew from the start of negotiations that the government would recommend jail time. We do not think that the statements made by the government could be reasonably understood to mean that it would recommend a sentence of a year or less, as defendant implies. We note that nowhere in his brief does defendant state specifically how much jail time he expected. Moreover, the prosecutor's statement, which is taken verbatim from defendant's brief, when read literally strongly suggests that it was made after the stipulation was signed, not before. The words, "you broke the roadblock," speak of an accomplished fact, i.e., the signing of the stipulation. The further sentence, "[w]e think that Mr. Martin should get some benefit from that," implies a gratuitous benefit to be conferred as a favor, not as an inducement to enter into a stipulation.
 
 
 58
 There is another factor that raises grave doubts as to defendant's claim of a breach of agreement by the government. There were two sentencing hearings: one on December 15, 1981, and the second, more than a month later on January 22, 1982. At the first hearing the prosecutor recommended eighteen months imprisonment and a $10,000 fine. The hearing continued for a considerable time after this recommendation (9 1/2 pages in the record) and at no time did defendant suggest that the government had breached any agreement. Nor was any motion to such effect filed between December 15 and the date of the second hearing on January 22, 1982.[18] It was at the second hearing that the court was first made aware that defendant might have a claim of breach of agreement or misrepresentation by the government. Defense counsel was specifically asked:
 
 
 59
 THE COURT: What are you asking for, Mr. Hundley, you want to go to trial in this case? He has signed a stipulation of fact. Is he now saying that this stipulation of fact was signed under, whether intentionally or otherwise, a misrepresentation and it would not have been signed, would not have been done, had you known the development the case was going to take?
 
 
 60
 Defense counsel's answer was as ambiguous and amorphous as the claim now advanced: "I'd like to give some thought to that." The court continued to try to ascertain whether defendant had been misled. It stated to defense counsel: "Mr. Gale [prosecutor] states that from Day 1 under no circumstances were you ever led to believe there would be anything but a recommendation for jail, ...." Defense counsel was then asked: "You deny that?" The response was: "No. I don't deny that." The prosecutor pointed out that prior to the first sentencing hearing defense counsel had never asked what the government's recommendation would be.
 
 
 61
 Our reading of the record convinces us that there was no breach of any prestipulation agreement by the government. Indeed, there is very little evidence of any plea bargain at all. Because we find that there was no breach of any prestipulation agreement by the government, we need not decide whether the stipulation should be treated as a guilty plea.
 
 II. Joinder
 
 62
 After the district court had severed the original trial into five separate ones, a number of the defendants, including appellant, moved for further severance. Appellant contended that scheduling defendant Banker for trial on Count V, in which appellant was not named, at the same time as appellant was to be tried on Count IV violated Federal Rule of Criminal Procedure 8(b)[19] and constituted prejudicial joinder invoking the provisions of Federal Rule of Criminal Procedure 14.[20] The district court in a careful and erudite opinion discussed the issues of misjoinder and prejudicial joinder and refused to make any further severances. It would be redundant for us to go over the same grounds again. We affirm the order of the district court denying further severance and adopt its opinion on this issue.[21]
 
 
 63
 The conviction is affirmed.
 
 SOUTHARD
 
 64
 Southard was tried by a jury with two codefendants for violating 18 U.S.C. Sec. 1084(a) and aiding and abetting its violation. The jury convicted him and acquitted the codefendant. One of the issues raised is also common to Ferris and Banker: whether the indictment was defective because it charged both a substantive violation and aiding and abetting. The other assigned errors are limited to this appellant: the failure to give limiting instructions before the introduction of evidence on the scope of Brian's gambling activities; the exclusion of certain tapes from evidence; and the alleged failure of the district court to instruct the jury on defendant's theory of defense.
 
 I. The Indictment
 
 65
 Appellant claims that the indictment was defective because it charged both a substantive violation of 18 U.S.C. Sec. 1084(a) and aiding and abetting. 18 U.S.C. Sec. 2 is a general provision applicable to most substantive criminal offenses. It provides: "Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." Section 2 does not define a crime; it imposes liability on a principal or those who aid and abet the commission of a crime. An indictment as an aider and abettor must always be accompanied by an indictment for a substantive offense.[22] United States v. Erb, 543 F.2d 438, 446 (2d Cir.), cert. denied, 429 U.S. 981, 97 S.Ct. 493, 50 L.Ed.2d 590 (1976). But not every substantive crime is susceptible to an aiding and abetting charge. The question is whether section 1084(a)[23] falls within one of the exceptions to the general rule that aiding and abetting goes hand-in-glove with the commission of a substantive crime.
 
 
 66
 The first exception is that the victim of a crime may not be indicted as an aider or abettor even if his conduct significantly assisted in the commission of the crime. Examples are persons who pay extortion, blackmail, or ransom monies. It is obvious that section 1084(a) does not involve victims; even a compulsive gambler cannot be described as a "victim" of the bookmakers with whom he bets.
 
 
 67
 The next exception embraces criminal statutes enacted to protect a certain group of persons thought to be in need of special protection. Accomplice liability will not be imposed upon the protected group absent an affirmative legislative policy to include them as aiders and abettors. For example, a woman who is transported willingly across state lines for the purpose of engaging in illicit sexual intercourse is not an accomplice to the male transporter's Mann Act violation. Gebardi v. United States, 287 U.S. 112, 119 (1932). Appellant claims that he was a mere bettor, not one "engaged in the business of betting or wagering," and therefore falls within the same category as the woman transported across state lines. This, of course, is primarily a question of proof. But even if we assume that defendant was only a bettor, he is not helped any. Section 1084(a) was not passed to protect bettors from their gambling proclivities. Its stated purpose was to assist the states in enforcing their own laws against gambling. H.Rep. No. 967, 87th Cong., 1st Sess., reprinted in 1961 U.S.Code Cong. & Ad.News 2631.
 
 
 68
 The final exception to accomplice liability upon which appellant relies occurs when the crime is so defined that participation by another is necessary to its commission. The rationale is that the legislature, by specifying the kind of individual who is to be found guilty when participating in a transaction necessarily involving one or more other persons, must not have intended to include the participation by others in the offense as a crime. This exception applies even though the statute was not intended to protect the other participants. Thus, one having intercourse with a prostitute is not liable for aiding and abetting prostitution, and a purchaser is not an accomplice to an illegal sale. See generally W. LaFave and A. Scott, Criminal Law, Sec. 65, at 521-22 (1977). Appellant argues that here the legislature has made criminally liable only those "engaged in the business of betting or wagering" and that the other participants are not within the compass of the statute. Therefore, appellant contends, he should only have been charged with the substantive crime, not aiding and abetting.
 
 
 69
 The flaw in this argument is that it assumes that the other participant is only a bettor[24] who does nothing to assist the principal in carrying on his gambling activities. The question, as the district court recognized, is not whether a mere bettor can be prosecuted as an aider and abettor, but whether a person not "in the business of betting or wagering" can be found guilty of assisting one who is. We think it clear that he can.
 
 
 70
 We have been unable to find any cases that discuss directly the propriety of an aiding and abetting prosecution in conjunction with a section 1084(a) offense. The cases we have found, however, indicate that indictment or conviction under both sections 1084(a) and 2 was not considered a problem. See United States v. Kail, 612 F.2d 443, 445 (9th Cir.1979) (defendant's conviction under Sec. 1084 and Sec. 2 affirmed), cert. denied, 446 U.S. 912, 100 S.Ct. 1842, 64 L.Ed.2d 266 (1980); United States v. Anderson, 542 F.2d 428, 436 (7th Cir.1976) (evidence insufficient to show either that defendant was "in the business" of gambling or that he was an aider and abettor); United States v. Kelley, 395 F.2d 727, 729 (2d Cir.) (defendant's conviction under Sec. 1084(a) and Sec. 2 affirmed), cert. denied, 393 U.S. 963, 89 S.Ct. 391, 21 L.Ed.2d 376 (1968).
 
 
 71
 The evidence, viewed in the light most favorable to the government, establishes clearly that none of the appellants raising this issue was a "mere bettor." The jury could reasonably have found, based on the telephone intercepts, that Banker and Southard were "engaged in the business of betting or wagering," that they exchanged line information with Brian and that they placed bets for him with other bookmakers. Ferris, whose involvement in this prosecution was the most tenuous of all the appellants, placed at least one bet for Brian with another bookmaker.[25] Because the actions of these three appellants exceeded those of mere bettors, we have no difficulty finding they were properly indicted.
 
 
 72
 We rule that the indictment was not defective.
 
 
 73
 II. The Failure to Give Limiting Instructions Before the Introduction of Evidence on the Scope of Brian's Gambling Activities
 
 
 74
 In Ferris' case the court instructed the jury that tapes of telephone calls between Brian and other persons and betting slips seized at Brian's house were limited to show only that Brian was in the business of betting and wagering. Because these limiting instructions were given, we held that such evidence was admissible. In Southard's case there were no limiting instructions and he argues that their absence was prejudicial error. We think not.
 
 
 75
 We first point out that, unlike the Ferris case, the only evidence admitted against Southard was the betting slips seized at Brian's home. Second, there was no request for a limiting instruction, either at the time the evidence was admitted or prior to the jury charge.[26] Before the evidence was introduced, the court gave defense counsel an opportunity to argue against its admission. At no time did defense counsel request or even suggest a limiting instruction though he had ample opportunity to do so. This was not the case of a trial judge peremptorily shutting off argument on an objection. Finally, our review of the evidence convinces us that, even if the court erred by failing to give a limiting instruction, such error was harmless beyond a reasonable doubt. The jury heard a number of telephone conversations between Southard and Brian from which it reasonably could have found that Southard, as well as Brian, was in the business of betting or wagering.
 
 
 76
 We hold for these reasons and those explicated in Ferris' case that no reversible error was committed by allowing the betting slips in evidence.
 
 III. The Exclusion of Evidence
 
 77
 The court excluded taped conversations between Brian and his son, Robert Baborian, offered by Southard to prove that Brian was just a bettor, not a bookmaker. The offer of proof was that Brian relied on his son's advice "in determining what games to bet, and when his son told him what games to bet, John Brian called Jackie [Southard] and other individuals and bet those games." This evidence was improperly excluded as hearsay. The taped conversations were not offered to prove the truth of the sports information conveyed from Baborian to Brian. They were offered to show that Brian relied on Baborian for betting information, which is evidenced by the "verbal acts" of the conversations. It was not asserted in the excluded conversations that Brian relied on Baborian. Although the excluded conversations were evidence from which the jury might find that Brian relied on someone else for sports information, they were irrelevant to the question of whether he was engaged in betting as a business. In any event, we think that, given the extensive proof that Brian was engaged in the business of gambling, it was harmless error to exclude the conversations.
 
 
 78
 IV. The Failure of the District Court to Instruct the Jury on the Theory of Southard's Defense
 
 
 79
 The defendant requested the following instruction: "Unless a person is engaged in the business of gambling or wagering the fact that he makes substantial bets on a regular basis does not constitute a violation of 18 United States Code 1084." This request was refused; instead, the court instructed the jury as follows:
 
 
 80
 Now, an individual engages in the business of betting or wagering if he regularly performs a function which is an integral part of such business. The individual need not be exclusively engaged in the business, nor must he share in the profits or losses of the business. He may be an agent or employee for another person's business, but the function he performs must provide a regular and essential contribution to that business. If an individual performs only an occasional or nonessential service or is a mere bettor, regardless of the amount wagered, or customer, he cannot properly be said to engage in the business.
 
 
 81
 The instruction on this point was clear and adequate; it covered the essentials of the requested instruction.
 
 The conviction is affirmed.[27]
 FALK
 
 82
 Falk stipulated to the same facts as did Martin. He was found guilty of violating 18 U.S.C. Sec. 1084(a). He was given permission to rely on the pertinent portions of the briefs of all other appellants and to file no brief. For the reasons stated in other portions of this opinion, his conviction is affirmed.
 
 BANKER
 
 83
 Banker was convicted by a jury of violating 18 U.S.C. Sec. 1084(a) and aiding and abetting its violation.[28] Only two of the issues he raises are discussed here:[29] the exclusion of certain evidence and the refusal of the district court to give a requested instruction.
 
 I. The Exclusion of Evidence
 
 84
 An important part of the government's case was a tape recording of five intercepted phone calls from Brian in Providence, Rhode Island, to defendant in Las Vegas, Nevada. The parties stipulated that the calls were dialed directly by Brian to defendant without operator assistance from a nonpay telephone. These calls were strong evidence that defendant had participated in the gambling business carried on by Brian.
 
 
 85
 The government also had to prove that defendant knew that the calls were interstate.[30] As part of his case, defendant offered in evidence a Nevada driver's license in the name of John Brian, issued in 1974 with an expiration date of 1979, and a work permit card issued in 1974 to a John Brian by the Sheriff's Department of Clark County, Nevada. This evidence was offered to negate the government's proof that defendant knew that the calls from Brian were made from outside Nevada. Although not explicitly spelled out in his brief, defendant's contention seems to be that from this evidence the jury could find that Brian was a resident of Nevada at the time the phone calls were made and that, therefore, defendant could reasonably have thought that Brian had called him from inside the state.[31]
 
 
 86
 The district court excluded the evidence. It ruled that the work permit was not relevant because it was dated 1974, and the intercepts were made in December of 1977. The driver's license was excluded on essentially the same ground; it did not show that Brian was in Nevada at the time the phone calls were made.
 
 
 87
 Although the district court did not exclude these documents on the grounds that they were not properly authenticated, defendant argues strenuously and at some length that they were self-authenticating documents under Federal Rule of Evidence 902. For purposes of our discussion, we will so assume. Defendant, however, seems to equate self-authentication with admissibility. They are two separate matters. Self-authentication merely eliminates the requirement of testimony by a public official that a document is authentic. It does not eliminate the requirement of relevancy.
 
 
 88
 The problem with this evidence is that no foundation for relevancy was laid. In the first place, as the district court pointed out, there was no showing that, apart from the name, the license and work card were those of John Brian, the codefendant in this case. Brian is not an uncommon name and the possibility of another John Brian having a Nevada driver's license and work permit cannot be precluded. There should have been testimony linking the codefendant Brian with the documents. But this alone would not have opened the door of admissibility. There was no evidence as to the relevancy of either document to residency or presence in Nevada at the time the intercepts were made. With regard to the work permit, witness Zimmerman testified only that a person wishing to work at a casino in Las Vegas must obtain a permit from the Sheriff's office. In an answer to a question implying that if a work permit were revoked, it would be physically taken from the person holding it, the witness replied: "I'm not sure of that." The foundation for the driver's license was equally flimsy. After the witness stated that he was familiar with Nevada's driver's licenses in effect in the 70's, he was asked: "Do you recognize this [the license] as a matter of form as a Nevada driver's license in effect during the 1970s, late 1970s?" The answer was "Yes," which proved absolutely nothing. The district court did not err in excluding as evidence the work permit and driver's license.
 
 II. The Jury Instruction
 
 89
 There was testimony attesting to defendant's good character. Defendant requested that the court instruct the jury that such evidence "standing alone" would justify an acquittal. He requested the following instruction:
 
 
 90
 You are instructed that evidence of an established reputation for honesty, veracity and integrity may be such as to raise a reasonable doubt that would alone justify an acquittal. Proof of a good reputation for honesty, veracity and integrity of one indicted for an offense may well by itself, if believed by you, create such a reasonable doubt as to justify acquittal notwithstanding the convincing nature of other evidence in the case.
 
 
 91
 The court refused to give the requested instruction. Instead, it instructed the jury as follows:
 
 
 92
 Now, in this case there was certain evidence as to reputation that was introduced. I instruct you that this evidence of an established reputation for honesty, veracity and integrity, that * * * is part of the evidence which you have to consider, because if you accept such evidence, it may be such as to raise a reasonable doubt in your mind which could justify an acquittal, but you consider that as evidence, along with all the other evidence in the case. It's all evidence in the case, members of the jury, when you are deciding and deliberating in your jury room.
 
 
 93
 The court's instruction was fully in accord with the law in this circuit. In United States v. Winter, 663 F.2d at 1147-48, we explored the state of the law on "standing alone" instructions and concluded: "We are certain that under the law of this circuit the district court did not err in refusing to instruct the jury that character evidence alone may raise a reasonable doubt as to guilt." Id. at 1148. Contrary to defendant's assertion, United States v. Angelini, 678 F.2d 380 (1st Cir.1982), has not changed the law or signalled that a change is coming. We held in Angelini that it was error to exclude evidence that defendant was law-abiding and truthful. We did not discuss at all a "standing alone" instruction.
 
 
 94
 The conviction is affirmed.
 
 LAURO
 
 95
 Lauro was tried by the court along with Baborian for having violated 18 U.S.C. Sec. 1084(a) and Sec. 2. Baborian was acquitted; Lauro was found guilty. The district court's opinion is published: United States v. Baborian, 528 F.Supp. 324 (D.R.I.1981).
 
 
 96
 Lauro does not dispute that he was engaged in the business of betting and wagering. His contention is that the government did not prove that he knowingly used the telephone for the transmission in interstate commerce of bets or wagers.
 
 
 97
 There is a preliminary question of law to be decided before we review the evidence: whether knowledge of the interstate nature of the telephone call must be proven as an element of a section 1084(a) offense. The government contends that the requirement that the call be interstate is jurisdictional only.
 
 
 98
 Section 1084(a) provides in pertinent part:
 
 
 99
 Whoever being engaged in the business of betting or wagering knowingly uses a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest, ....
 
 
 100
 We emphasize the obvious, that the word "knowingly" is used in the statute. Its omission would neither distort nor detract from the purpose of the statute. It can hardly be argued that one could use a wire communication facility unwittingly or unknowingly. We think the inclusion of "knowingly" in the statute means that knowledge of the interstate nature of the wire facility transmission is an element of the crime that must be proved.
 
 
 101
 The paucity of cases on point is a good indication that in most prosecutions under section 1084, the government, defendant, and the court have assumed that scienter is an element of the offense. In Sagansky v. United States, 358 F.2d 195 (1st Cir.), cert. denied, 385 U.S. 816, 87 S.Ct. 36, 17 L.Ed.2d 55 (1966), we assumed that such knowledge must be proven in finding that there was circumstantial evidence from which a jury could find that the defendant "knew that it was a long distance call from another state." Id. at 199 n. 4. In United States v. Barone, 467 F.2d 247 (2d Cir.1972), the court stated: "The appellants and the Government both assume, and we agree, that a conviction of conspiracy to violate 18 U.S.C. Sec. 1084 requires a showing that the defendant knew or could reasonably foresee that interstate communication would be used in furtherance of the plan of action." Id. at 249. The Ninth Circuit made the same assumption in Cohen v. United States, 378 F.2d 751, 754 (9th Cir.), cert. denied, 389 U.S. 897, 88 S.Ct. 217, 19 L.Ed.2d 215 (1967), when it considered and rejected appellant's argument that "the evidence was insufficient to show his awareness that the telephone calls originated outside Nevada."
 
 
 102
 The government's argument is two-pronged. First, it relies on two section 1084 cases. In United States v. Sellers, 483 F.2d 37, 45 (5th Cir.1973), cert. denied, 417 U.S. 908, 94 S.Ct. 2604, 41 L.Ed.2d 212 (1974), the court raised, but did not decide, the question whether the statute requires actual knowledge of the nonlocal origin of the telephone transmissions. It referred in a footnote to United States v. Swank, 441 F.2d 264 (9th Cir.1971) (per curiam). Swank held, without discussion, that "the knowing use of interstate facilities is not an essential element of either the substantive offense or the conspiracy to commit it." Id. at 265. With all due respect, we think this holding is wrong. The second part of the government's argument draws from United States v. Feola, 420 U.S. 671, 676-86, 95 S.Ct. 1255, 1259-1264, 43 L.Ed.2d 541 (1975), which held that one may be convicted of assaulting a federal officer under 18 U.S.C. Sec. 111 without knowing that the victim was a federal officer. The fatal flaw that prevents a linkage of the two cases is the omission from 18 U.S.C. Sec. 111 of the word "knowingly" or its equivalent.[32] Our reasoning in United States v. Perkins, 488 F.2d 652 (1st Cir.1973), cert. denied, 417 U.S. 913, 94 S.Ct. 2612, 41 L.Ed.2d 217 (1974) applies:
 
 
 103
 Moreover, although most criminal statutes enacted by Congress specifically and unmistakably provide for a requirement of scienter, Sec. 111 "contains no words which would indicate that a person who commits one of the proscribed acts must do so with knowledge that his victim is a federal officer ...." United States v. Goodwin, 440 F.2d 1152, 1155 (3d Cir.1971). Had Congress intended otherwise, "it could easily have made knowledge an essential ingredient." United States v. Lombardozzi, 335 F.2d 414, 416 (2d Cir.), cert. denied, 379 U.S. 914, 85 S.Ct. 261, 13 L.Ed.2d 185 (1964).
 
 
 104
 Id. at 654. Congress has made knowledge an element of the crime defined in 18 U.S.C. Sec. 1084.
 
 
 105
 We now turn to the question whether the government has proved beyond a reasonable doubt that Lauro knew that an interstate telephone call was made to him. We review the evidence, together with all legitimate inferences to be drawn therefrom, in the light most favorable to the government. United States v. Winter, 663 F.2d at 1127. We also keep in mind that guilty knowledge may be shown by circumstantial evidence as well as direct evidence, and that the circumstantial evidence need not compel a finding of such knowledge in order to sustain a conviction. United States v. Flaherty, 668 F.2d 566, 579 (1st Cir.1981).
 
 
 106
 The evidence consisted primarily of monitored telephone calls; Lauro did not testify. A little background and description of the three participants is necessary. Robert Baborian, codefendant of Lauro, was the son of John Brian. Brian can fairly be characterized as an extensive gambler. His phone was tapped and the calls involved were to or from him. Lauro, as already noted, operated a gambling business in Rhode Island. Baborian (son of Brian) is best described as a gambler of sorts. The calls between Brian and Lauro were made within Rhode Island.
 
 
 107
 The scenario begins with a phone call between Baborian and his father (Brian) on December 14, 1977, when Baborian was in New York. Baborian asked his father to place bets for him with Lauro. Brian called Lauro within a short time and placed the bets. Lauro concedes that, based on that telephone call, it can be found that he knew Baborian was in New York on December 14.
 
 
 108
 We focus now on four telephone calls made in the evening of December 16, 1977, between 6:15 and 6:55. The first call, at 6:15, was from Baborian to his father. He told his father that he was ten or fifteen minutes from New Haven, Connecticut, and asked him to phone Lauro and place certain bets. The second call, at 6:36, was from Brian to Lauro. Brian placed the bets for his son and told Lauro that he had just finished talking to his son who had called him from New Haven and "was driving on." Baborian called his father again at 6:51 and told him he had just talked to Lauro about some bets, had made a mistake, and asked his father to call Lauro and verify the bets. The fourth and final call was from Brian to Lauro at 6:55 to check the bets his son had placed. Lauro verified that Baborian had called him.
 
 
 109
 The key telephone conversation was the unmonitored one between Baborian and Lauro. The district court found that Lauro knew the call was interstate. The court reached this conclusion by taking judicial notice "that no one could possibly drive from New Haven, Connecticut, to the Rhode Island line in the 15-minute interval between the telephone calls of 6:36 p.m. and 6:51 p.m. See Fed.R.Evid. 201."[33] 528 F.Supp. at 332.
 
 
 110
 The question is whether this judicially noticed fact can be attributed to the defendant. We think not. It is one thing to take judicial notice of the driving time between New Haven and the Rhode Island line. It is quite another to use this fact as a basis for a finding that the defendant actually knew it.
 
 
 111
 The only evidence that the government had as to Lauro's knowledge was that at 6:36 (second call) Brian told him that his son had called from New Haven, Connecticut. Sometime between 6:36 and 6:51 Baborian called Lauro. There is no evidence from which it could be found that Lauro knew or should have known the driving time between New Haven, Connecticut, and the Rhode Island line; in fact, there is no evidence that Lauro knew where New Haven was. The only thing we know about Lauro is derived from his sister's testimony: he got his nickname, "Poochie," from his habit of following her around when he was a child. The prosecutor did not ask Lauro's sister the questions necessary for the judicially-noticed fact to become operative: did Lauro own an automobile, and if so, had he ever driven from Rhode Island to New Haven; how long Lauro lived in Rhode Island and what his educational background was (to show his knowledge of the location of New Haven vis-a-vis Rhode Island).
 
 
 112
 If the government had established that Lauro knew something about the distance or driving time between New Haven and Rhode Island, then the judicially-found fact that it was impossible to drive from New Haven to Rhode Island in fifteen minutes, which is undoubtedly true, could be utilized to infer that Lauro knew that the call from Baborian was made from Connecticut. But we have found no evidence, and the district court has pointed to none, that could be the basis for such a finding. When the knowledge to be proved is an element of the crime it cannot be assumed, even though such assumption is reasonable. It is the personal knowledge of the defendant that must be proved. Although we hesitate to lay down a hard and fast rule, we are hard put to think of a situation in which a judicially-noticed fact could be used as the basis for proving knowledge of that fact by the defendant.[34]
 
 
 113
 The conviction is reversed for failure of proof.
 
 BRIAN
 
 114
 Brian was convicted of violating 18 U.S.C. Sec. 1955 on the basis of stipulated facts obtained from a court authorized wiretap of his telephone. He appeals the district court's refusal to suppress the evidence garnered from the wiretap. Appellant posits three grounds for suppression:
 
 
 115
 1. 18 U.S.C. Sec. 2518(1) is facially unconstitutional;
 
 
 116
 2. the wiretap application was insufficient under 18 U.S.C. Sec. 2518(1)(c) because it did not show that other investigative techniques would not suffice; and
 
 
 117
 3. conversations were admitted into evidence contrary to the provisions of Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (the Act).
 
 
 118
 I. The Constitutional Challenge to 18 U.S.C. Sec. 2518(1)
 
 
 119
 18 U.S.C. Sec. 2518(1) provides that a wiretap may be authorized on grounds, inter alia, that a particular offense "has been, is being, or is about to be committed," 18 U.S.C. Sec. 2518(1)(b)(i) (emphasis added). One of the reasons for passing the Act was the finding of Congress that "[o]rganized criminals make extensive use of wire and oral communications in their criminal activities. The interception of such communications to obtain evidence of the commission of crimes or to prevent their commission is an indispensable aid to law enforcement and the administration of justice." Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. No. 90-351, tit. III, Sec. 801, 82 Stat. 211 (emphasis added).
 
 
 120
 Appellant contends that the phrase "or is about to be committed" is an unconstitutional enlargement of the fourth amendment concept of probable cause. No cases are cited for this novel proposition. Appellant does cite Brinegar v. United States, 338 U.S. 160 at 175-76, 69 S.Ct. 1302 at 1310-1311, 93 L.Ed. 1879 (1949), which defines probable cause as such facts as would lead a person of reasonable caution to believe that "an offense has been or is being committed." We refuse to interpret Brinegar as holding or even suggesting that the fourth amendment prohibits a search warrant, although there is probable cause to believe that a crime "is about to be committed." Such an interpretation flies in the face of reason and common sense. If a reliable informant told the F.B.I. that the blue prints, tools, and weapons for a planned robbery were located on certain premises, we think it clear that a search warrant would issue. The basic question is whether there is probable cause for issuing the warrant, not whether the criminal conduct is past, present or future.
 
 
 121
 The constitutionality of the Act has survived a number of challenges,[35] but we have found no case in which a constitutional challenge on this particular ground was made. We hold that 18 U.S.C. Sec. 2518(1)(b) is not facially unconstitutional.
 
 
 122
 II. The Sufficiency of the Application Under 18 U.S.C. Sec. 2518(1)(c)
 
 
 123
 Under the Act, an application for a wiretap must include, inter alia, "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. Sec. 2518(1)(c).
 
 
 124
 The seminal case in this circuit on this issue is United States v. Scibelli, 549 F.2d 222 (1st Cir.), cert. denied, 431 U.S. 960, 97 S.Ct. 2687, 53 L.Ed.2d 278 (1977), in which we discussed the requirements of section 2518(1)(c) in light of its legislative history and the case law. Id. at 226-28. We identified three basic considerations: (1) "An appeals court's role is not to make a de novo determination of sufficiency as if it were a district judge, but to decide if the facts set forth in the application were minimally adequate to support the determination that was made"; (2) "the inquiry is whether the affidavit provided a sufficient basis for a finding of probable cause"; and (3) "in determining the sufficiency of the application a reviewing court must test it in a practical and commonsense manner." Id. at 226 (citations omitted). We pointed out that section 2518(1)(c) was not intended to force the government to exhaust all other investigative procedures before resorting to a wiretap application. Id. at 226. See also United States v. Almonte, 594 F.2d 261, 264 (1st Cir.1979); United States v. Gerardi, 586 F.2d 896, 897-98 (1st Cir.1978); United States v. Santarpio, 560 F.2d 448, 452 (1st Cir.), cert. denied, 434 U.S. 984, 98 S.Ct. 609, 54 L.Ed.2d 478 (1977).
 
 
 125
 With these considerations in mind, we turn to an examination of the application. The pertinent portions of the affidavit can be summarized as follows: The telephone facilities are located in private premises so that it is impossible for law enforcement officials to observe the gambling activities within the premises (para. 24). The informants have all indicated that they are unwilling to testify for fear of their lives (para. 25). Immunity will not work because those with the important knowledge are those who will be prosecuted (para. 25a). Raids and searches of individuals are usually not productive in gambling cases (para. 26). Infiltrating the gambling operation would not result in identifying all those involved (para. 27). These facts constitute an adequate explanation of why other investigatory procedures would not be likely to succeed.
 
 
 126
 We hold that under the standards of this circuit the district court's authorization order must be upheld.
 
 
 127
 III. The Alleged Use of Evidence Contrary to the Provisions of the Act
 
 
 128
 Appellant claims the government violated the wiretap statute by intercepting conversations that were not designated in the original application and authorization, and by failing to obtain judicial authorization for the use of such evidence "as soon as practicable" as required under 18 U.S.C. Sec. 2517(5).
 
 
 129
 It is necessary to set forth the sequence of what took place. On December 6, 1977, application for a wiretap of defendant's phone was made. It alleged probable cause to believe that offenses in violation of 18 U.S.C. Secs. 1084, 1952, and 371 were being committed. Judicial authorization issued on the same day. Telephone conversations were intercepted and recorded during the period December 17 to December 22, 1977, some of which showed violations of 18 U.S.C. Sec. 1955. On July 31, 1979, almost nineteen months after the authorization issued, application was made under 18 U.S.C. Sec. 2517(5)[36] to use conversations showing violations of 18 U.S.C. Sec. 1955 pursuant to 18 U.S.C. Sec. 2517(3).[37] Authorization for such use was granted by the district court on the same day. This evidence was then disclosed to a grand jury. On April 17, 1980, the grand jury indicted defendant for violating 18 U.S.C. Secs. 1955 and 1084 as well as Secs. 371 and 2. Brian was convicted on stipulated facts solely for violating 18 U.S.C. Sec. 1955.
 
 
 130
 Our resolution of the issue must be made in light of the Supreme Court's holding on the basic requirements for suppression.
 
 
 131
 Resolution of that question [suppression] must begin with United States v. Giordano, 416 U.S. 505 [, 94 S.Ct. 1820, 40 L.Ed.2d 341] (1974), and United States v. Chavez, 416 U.S. 562 [, 94 S.Ct. 1849, 40 L.Ed.2d 380] (1974). Those cases hold that "[not] every failure to comply fully with any requirement provided in Title III would render the interception of wire or oral communications 'unlawful.' " Id. at 574-575 [, 94 S.Ct. 1855-1856]. To the contrary, suppression is required only for a "failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." United States v. Giordano, supra, [416 U.S.] at 527 [, 94 S.Ct. at 1832].
 
 
 132
 United States v. Donovan, 429 U.S. 413, 433-34, 97 S.Ct. 658, 670-671, 50 L.Ed.2d 652 (1977). See United States v. Civella, 533 F.2d 1395, 1400-01 (8th Cir.1976), cert. denied, 430 U.S. 905, 97 S.Ct. 1174, 51 L.Ed.2d 581 (1977).
 
 
 133
 18 U.S.C. Sec. 2518(1)(a-e) specifies the information required in an application for an order authorizing the interception of telephone conversations. Section 2518(1)(b)(i)[38] requires "details as to the particular offense that has been, is being, or is about to be committed." (emphasis added) As the facts disclose, section 1955 violations were not specified in the application and the judicial authorization for the intercept did not mention section 1955. This, however, as appellant recognizes, is not a per se ground for suppression.
 
 
 134
 Nor does any constitutional infirmity arise from the fact that the 27 July tap yielded much greater evidence of gambling than of narcotics activity. Officers attending a properly authorized, limited, and supervised wiretap have no obligation to close their ears to unexpected incriminating information on matters unrelated to their immediate investigation. They have a legal right to their position within electronic earshot of conversations over certain telephones within certain time limitations. Like an officer who sees contraband in plain view from a vantage point where he has a right to be, one properly overhearing unexpected villainy need not ignore such evidence.
 
 
 135
 United States v. Johnson, 539 F.2d 181, 188 (D.C.Cir.1976) (footnote omitted), cert. denied, 429 U.S. 1061, 97 S.Ct. 784, 50 L.Ed.2d 776 (1977). See also United States v. Vento, 533 F.2d 838, 853 (3d Cir.1976).
 
 
 136
 The officers conducting the wiretap surveillance were fully justified in continuing to monitor those gambling conversations which provided evidence of section 1955 violations. The similarity between section 1955[39] and section 1084[40] offenses makes it highly probable that the same person will violate both statutes. Further, the same conversations will often show a violation of both statutes. Section 1955 subjects to fine and imprisonment "[w]hoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business." Section 1084 prohibits the use of interstate wire communication facilities for betting or wagering by one "engaged in the business of betting or wagering." Because of the similarity of the two statutory provisions appellant can claim no harm or unfair surprise from the monitoring of all of his gambling related telephone calls under a wiretap authorization specifying only section 1084 violations. This violation of section 2518(1)(b)(i)'s particularity requirement does not warrant suppression of the wiretap evidence.
 
 
 137
 The use of intercepted conversations containing evidence of section 1955 violations implicates section 2517(5) of the Act. This section was designed to cover a situation such as this in which "an investigative or law enforcement officer, while engaged in intercepting wire or oral communications in the manner authorized herein, intercepts wire or oral communications relating to offenses other than those specified in the order of authorization or approval." It provides that such evidence may be used in any criminal proceeding "when authorized or approved by a judge of competent jurisdiction where such judge finds on subsequent application that the contents were otherwise intercepted in accordance with the provisions of this chapter. Such application shall be made as soon as practicable."
 
 
 138
 Here, nineteen months passed between the recording of the implicating conversations and the application for their use as evidence. Appellant argues strenuously that the application could and should have been made long before it was, and that the nineteen-month delay constituted a per se violation of the "as soon as practicable" requirement of section 2517(5). The government explained the long hiatus by stating that the conversations' relevance "has only become apparent upon a recent analysis of the results of the wire interceptions." We recognize that 18 U.S.C. Sec. 1955 and 18 U.S.C. Sec. 1084, though similar, are different offenses and that a detailed study of the intercepts was necessary to determine which statute was being violated. Although nineteen months seems an inordinate amount of time for analyzing the intercepted conversations, we do not think that such a delay automatically triggers suppression.
 
 
 139
 We note first that appellant has not alleged that the delay prejudiced him in any way. Although this is not determinative, it shifts our focus from the effect on the appellant to a consideration of whether the delay contravenes a basic policy requirement of the Act. See United States v. Donovan, 429 U.S. at 433-34, 97 S.Ct. at 670-671. "A determination of whether the order was obtained 'as soon as practicable' requires an examination of the purposes of section 2517(5)." United States v. Vento, 533 F.2d at 855.
 
 
 140
 We agree with the Fifth Circuit that by enacting section 2517(5), "Congress wished to assure that the Government does not secure a wiretap authorization order to investigate one offense as a subterfuge to acquire evidence of a different offense for which the prerequisites to an authorization order are lacking." United States v. Campagnuolo, 556 F.2d 1209, 1214 (5th Cir.1977). See also United States v. Vento, 533 F.2d at 855. We discern no subterfuge here. As explained above, the similarity between section 1955 and section 1084 offenses makes it difficult to determine whether a particular gambling related conversation is more appropriately proof of the violation of one statutory provision rather than another. We find that the application for authorization to use the intercepts to demonstrate section 1955 violations was sought in good faith.
 
 
 141
 The application procedure is also important. Here, the intercepts were disclosed to a grand jury prior to indictment. This is significantly different than the procedure followed in a case on which appellant relies, United States v. Brodson, 528 F.2d 214 (7th Cir.1975). Brodson concerned an authorization for intercepts showing violations of section 1955. The application for section 1084 use was filed just prior to trial. The government had disclosed the intercepts allegedly showing violation of section 1084 to a grand jury without judicial authorization. The Seventh Circuit dismissed the indictment because "the Government itself has violated the key provision of the legislative scheme of Section 2517(5)."[41] Id. at 216. There was no such violation here. The mandate of section 2517(5) was observed.
 
 
 142
 We find no reason to suppress the evidence of violations of section 1955 on either statutory or constitutional grounds.[42]
 
 
 143
 The conviction is affirmed.
 
 KACHOUGIAN
 
 144
 Kachougian entered into essentially the same stipulation of facts with the government as did Brian. He was also found guilty by the court of violating 18 U.S.C. Sec. 1955. Other than the Franks' hearing issue, the only issue raised by appellant is that under the stipulation of facts no crime was shown.
 
 
 145
 Count I of the indictment, in which defendant was charged, tracked the language of the statute and charged that Kachougian (and others) was "part of an illegal gambling business involving bookmaking in violation of the laws of the State of Rhode Island, 1956, 1969 Re-enactment, Section 11-19-14." The Rhode Island statute makes it illegal, inter alia, to "record or register bets or wagers or sell pools upon the result of any trial or contest of skill, speed or power of endurance of man or beast." R.I.Gen.Laws Sec. 11-19-14. The pertinent parts of the stipulation stated:
 
 
 146
 1. The defendants John Brian, Raphael Wax, Harry Kachougian, Vincent Quinterno, Anna Quinterno and others willfully and knowingly did conduct a gambling business involving the placement and acceptance of bets and wagers on sporting events during the period November 5, 1977 through December 21, 1977 in the District of Rhode Island and elsewhere.
 
 
 147
 ....
 
 
 148
 6. It was the role of Harry Kachougian to accept bets and wagers and to record and register bets and wagers from within a private ground (house) within the state of Rhode Island and occupy said house with books, papers and paraphernalia for the purpose of receiving and recording and registering money bet and wagered for another person for the purpose of operating and conducting the gambling business.
 
 
 149
 Appellant's argument is a combination of ingenuity and chutzpah. He claims that his stipulation that he conducted "a gambling business involving the placement and acceptance of bets and wagers on sporting events " in Rhode Island does not mean that he violated the state statute which prohibits recording bets "upon the result of any trial or contest of skill, speed or power of endurance of man or beast." This contention simply cannot be taken seriously. The stipulation clearly established a violation of the Rhode Island bookmaking statute.
 
 
 150
 Nor is there any merit to appellant's contention that he was convicted of a crime not charged in the indictment, occupying a house containing gambling paraphernalia as set forth in paragraph 6 of the stipulation. This completely overlooks paragraphs 1, 2, and 3 of the stipulation which track the language of Count I of the indictment.
 
 
 151
 The conviction is affirmed.
 
 ANNA and VINCENT QUINTERO
 
 152
 These appellants stipulated to the same facts as did Brian and Kachougian. They were also convicted of violating 18 U.S.C. Sec. 1955. They have filed no briefs and rely entirely on the brief and argument of Brian.
 
 
 153
 The convictions are affirmed.
 
 SUMMARY
 
 154
 All convictions are affirmed except that of Lauro which is reversed.
 
 
 
 *
 Of the Sixth Circuit, sitting by designation
 
 
 [1]
 For example, Conley provided the following background information about informant No. 1:
 Informant # 1, is known to me because of Informant # 1's conversations with me, to be currently involved in gambling activities and has been so engaged for over seven (7) years. Informant # 1 has told me he associates with persons known by SAs of the Federal Bureau of Investigation, Providence, Rhode Island, to be bookmakers and gamblers, and during the past four (4) years, has furnished information to me which has been corroborated and proved to be reliable by independent investigations by the Federal Bureau of Investigation and State Police. The information furnished by Informant # 1 has never proved to be false. This information has led to the identification of numerous persons involved in gambling activities currently under investigation, and to the conviction of at least nine (9) persons charged with violations of gambling laws.
 Brian App. at 40.
 
 
 [2]
 The government alleges that there were an additional seven unidentified voices on the tapes of the two tapped telephones
 
 
 [3]
 Our discussion of the transcripts of the telephone conversations is not to be taken as indicating our belief that the informants must have been one of the unidentified voices. As the district court explained: "Defendants have not eliminated the possibility that the informants were good friends of theirs, were fellow defendants in this case, or that the Government does not delete names of informants who make calls during wire interceptions." United States v. Brian, 507 F.Supp. 761, 765 (D.R.I.1981)
 
 
 [4]
 Agent Conley, in his affidavit, never claimed that there was a telephone in the Armenian Club. Conley's affidavit contained only informant No. 1's statement that "Garabedian, who lives on Whipple Street, uses the Armenian Club on Douglas Avenue, Providence, Rhode Island, as his center of gambling business ...." Brian App. at 40. Other information supplied by informant No. 1 stemmed from conversations actually held at the Armenian Club
 
 
 [5]
 The government attempts to bolster Conley's credibility and attack the veracity of the appellants' affidavits by pointing to the numerous gambling-related conversations which were intercepted by the wiretap. This, however, raises a problem of circularity; the government is using the results of a wiretap to prove that there was probable cause to authorize the tap. This is like trying to introduce the fruits of an alleged illegal search to prove that the search met fourth amendment requirements. We, therefore, do not rely on the contents of the tap in affirming the district court's determination that Conley was a credible witness, and that appellants failed to make the "substantial preliminary showing" required by Franks
 
 
 [6]
 Appellants suggest that the Franks requirement of a "substantial preliminary showing" should be interpreted as mandating a Franks hearing whenever defendants demonstrate "a substantial possibility of affiant perjury." Brief for Brian at 9 (quoting Note, Franks v. Delaware: A Proposed Interpretation and Application, 1980 U.Ill.L.F. 601, 615 (footnote omitted)). Unless we were willing to hold that a substantial possibility of perjury existed whenever an affiant relied on confidential informants, appellants' unsupported denials cannot be seen as satisfying even the suggested standard
 
 
 [7]
 The report was contained in the court order suppressing the materials seized from appellant Southard and his automobile
 
 
 [8]
 In Re: In Camera Interview of Special Agent Martin Conley
 In accordance with the opinion issued February 9, 1981, this Court has held an in camera interview of Special Agent Martin Conley to inquire into certain aspects of his affidavit supporting the December, 1977 wiretap. Agent Conley's representation that there are in fact several "unidentified callers" on the tap, coupled with certain other information revealed at the interview, has satisfied this Court that defendants' concerns about the affidavit are unfounded.
 I wish to make two additional points, however. The first regards the government's handling of this matter. The government was put on notice that defendants attached special significance to the purported absence of any "unidentified callers" on the tap. Moreover, in its opinion of February 9, this Court regarded that allegation as establishing "some minimal inconsistency" in the government's materials, so as to justify an in camera interview. Despite all this focus on the "unidentified caller" issue, the government waited until the interview actually took place to inform the Court that there were indeed numerous voices on the tap that were not identified. Had the government bothered to let the Court in on this fact when the issue was first raised, considerable time and energy could have been saved.
 The second point regards release of the informants' names. The revelation that there are unidentified callers on the tap undercut much of the need for the in camera interview; in addition, Agent Conley provided certain other minimally corroborating information. Therefore, knowing full well the vital role confidentiality plays in the informant system, the Court did not ask Agent Conley to name his sources. One thing must be emphasized, however. Had the "unidentified caller" issue not been resolved, and had the Court been the least bit suspicious that Agent Conley was not being truthful, I would have had no hesitancy whatsoever in ordering him to reveal the names to the Court and, if necessary, to produce the informants for in camera examination. Nor would I have hesitated to enforce these orders by appropriate sanctions.
 The allegation that a law enforcement official has deliberately lied to the Court in order to obtain leave to search and seize is an extremely serious charge. It implicates not only the constitutional rights of the defendant but also the integrity of the Court and its process. If the charge appears to have some foundation, the Court must inquire further. In this inquiry, the Court will do all in its power to accommodate the legitimate concerns for safeguarding the informant process. However, it cannot and will not permit the plea of "confidentiality" to assume such disproportionate significance that it insulates government conduct from all scrutiny. Cf. United States v. Nixon, 418 U.S. 683, 707-13, 94 S.Ct. 3090, 3107-3110, 41 L.Ed.2d 1039 (1974).
 
 
 [9]
 The propriety of an indictment for both a section 1084(a) violation and aiding and abetting its violation is discussed in Southard's case
 
 
 [10]
 18 U.S.C. Sec. 1084(a) provides in pertinent part:
 (a) Whoever being engaged in the business of betting or wagering knowingly uses a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest, ....
 
 
 [11]
 These calls were between Providence, Rhode Island, where Brian carried on his activities, and Somerset, Massachusetts, where defendant operated a restaurant
 
 
 [12]
 "You see, someone has to be engaged in the business of betting or wagering in order to consider aiding and abetting, so you look to Mr. Brian, and the Government's position is Mr. Brian was in the business of betting and wagering, and in considering that you apply the definition I have just given to you as to what constitutes being in the business of betting or wagering, and if within the context of that definition you find that Mr. Brian was in the business of betting or wagering, then you consider whether or not he indeed was aiding or abetting Mr. Brian."
 
 
 [13]
 "In order to aid and abet another to commit a crime, it is necessary that the accused willfully associate himself in some way with the criminal venture, and in this case it's necessary that you find Mr. Ferris willfully assisted himself with the criminal venture, that is, the criminal venture of Mr. Brian in the business of betting and wagering, and that he willfully participated, participates in it, and he does it as though it was something he wished to bring about, that is to say, that he willfully seeks by some act of his or some omission of his to make the criminal venture succeed, to make that business succeed."
 
 
 [14]
 Defendant refers at three places in his brief to a violation of Fed.R.Crim.P. 21. We assume he was referring to Rule 31 which concerns verdicts; Rule 21 has to do with transfers from the district for trial
 
 
 [15]
 Fed.R.Crim.P. 31 provides in pertinent part:
 (a) Return. The verdict shall be unanimous. It shall be returned by the jury to the judge in open court.
 ....
 (c) Conviction of Less Offense. The defendant may be found guilty of an offense necessarily included in the offense charged or of an attempt to commit either the offense charged or an offense necessarily included therein if the attempt is an offense.
 (d) Poll of Jury. When a verdict is returned and before it is recorded the jury shall be polled at the request of any party or upon the court's own motion. If upon the poll there is not unanimous concurrence, the jury may be directed to retire for further deliberations or may be discharged.
 
 
 [16]
 In a subsequent trial defendant Banker objected to the use of such a form and it was not used
 
 
 [17]
 Fed.R.Crim.P. 52(b) provides:
 (b) Plain Error. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.
 
 
 [18]
 The court continued the first hearing to see if the government would agree to a Rule 20(a) transfer for plea and sentencing. The government did not agree
 
 
 [19]
 Fed.R.Crim.P. 8(b) provides:
 (b) Joinder of Defendants. Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.
 
 
 [20]
 In pertinent part, Fed.R.Crim.P. 14 provides:
 If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.
 
 
 [21]
 The government argues that because Martin was tried alone by stipulation there could be no misjoinder and, even if there were, it was harmless error. We are aware, of course, that there is a line of cases standing for the proposition that Rule 8 misjoinder can be harmless. See, e.g., United States v. Martin, 567 F.2d 849 (9th Cir.1977); Baker v. United States, 401 F.2d 958 (D.C.Cir.) (per curiam), cert. denied, 393 U.S. 836, 89 S.Ct. 110, 21 L.Ed.2d 106 (1968); United States v. Granello, 365 F.2d 990 (2d Cir.1966), cert. denied, 386 U.S. 1019, 87 S.Ct. 1367, 18 L.Ed.2d 458 (1967). The rule in this circuit, however, has followed the traditional view that misjoinder is prejudicial per se. King v. United States, 355 F.2d 700, 703 (1st Cir.1966). This view, which started with McElroy v. United States, 164 U.S. 76, 17 S.Ct. 31, 41 L.Ed. 355 (1896), is followed in a number of circuits. See, e.g., United States v. Nettles, 570 F.2d 547 (5th Cir.1978); United States v. Whitehead, 539 F.2d 1023 (4th Cir.1976); Metheany v. United States, 365 F.2d 90 (9th Cir.1966); Cupo v. United States, 359 F.2d 990 (D.C.Cir.1966), cert. denied, 385 U.S. 1013, 87 S.Ct. 723, 17 L.Ed.2d 549 (1967)
 Because we affirm the finding of the district court, there is no need to decide whether the harmless error rule should be adopted in this circuit.
 
 
 [22]
 The proof required for a conviction of aiding and abetting a violation of section 1084(a) is discussed in the Ferris case
 
 
 [23]
 Section 1084(a) provides in pertinent part:
 Whoever being engaged in the business of betting or wagering knowingly uses a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest, ....
 
 
 [24]
 The district court held that the statute did not prohibit the activities of "mere bettors." We take no position on this ruling except to point out that the legislative history is ambiguous on this point at best
 
 
 [25]
 For a discussion of the sufficiency of the evidence establishing Ferris' aiding and abetting conviction, refer to the portion of this opinion dealing specifically with Ferris
 
 
 [26]
 Defendant does not attack the jury charge on this ground, perhaps realizing the barrier imposed by Fed.R.Crim.P. 30
 
 
 [27]
 Because there is no essential difference between the positions of Southard and Martin on alleged misjoinder and severance, we find against Southard on the basis of our holding on this issue in Martin's case
 
 
 [28]
 Banker expressly requested that the court not ask the jury to return separate verdicts on each charge
 
 
 [29]
 The other issues raised by Banker are discussed in other parts of the opinion: the Franks hearing issue; the claim that the indictment was defective because it charged both a substantive violation of 18 U.S.C. Sec. 1084(a) and a violation of 18 U.S.C. Sec. 2; and the admission of the Brian-Kachougian conversations and records
 
 
 [30]
 We hold, contrary to the government's contention, that knowledge of the interstate nature of the telephone calls is an element of the crime defined in 18 U.S.C. Sec. 1084(a). There is a full discussion of this holding in that part of the opinion devoted to appellant Lauro
 
 
 [31]
 It was stipulated that the calls were made from Providence, Rhode Island. The stipulation, however, was not evidence that defendant knew that the calls were made from Providence. Defendant did not testify
 
 
 [32]
 18 U.S.C. Sec. 111 provides as follows:
 Whoever forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title while engaged in or on account of the performance of his official duties, shall be fined not more than $5,000 or imprisoned not more than three years, or both.
 Whoever, in the commission of any such acts uses a deadly or dangerous weapon, shall be fined not more than $10,000 or imprisoned not more than ten years, or both.
 
 
 [33]
 Rule 201. Judicial Notice of Adjudicative Facts
 (a) Scope of rule. This rule governs only judicial notice of adjudicative facts.
 (b) Kinds of facts. A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.
 (c) When discretionary. A court may take judicial notice, whether requested or not.
 (d) When mandatory. A court shall take judicial notice if requested by a party and supplied with the necessary information.
 (e) Opportunity to be heard. A party is entitled upon timely request to an opportunity to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed. In the absence of prior notification, the request may be made after judicial notice has been taken.
 (f) Time of taking notice. Judicial notice may be taken at any stage of the proceeding.
 (g) Instructing jury. In a civil action or proceeding, the court shall instruct the jury to accept as conclusive any fact judicially noticed. In a criminal case, the court shall instruct the jury that it may, but is not required to, accept as conclusive any fact judicially noticed.
 
 
 [34]
 We have been unable to find any cases or authority directly on point. We have held, however, that when knowledge is an element of the crime it should be proven on the record by facts from which the defendant's knowledge can be inferred. In United States v. Parrilla Bonilla, 648 F.2d 1373 (1st Cir.1981), the issue was whether defendants knew that their entry onto a beach used by the government for amphibious maneuvers was unlawful. Because defendants were part of a large group that had gathered to protest the maneuvers, the district court held on the basis of "common sense and experience" that defendants must have known that going onto the beach was unlawful. We observed: "While this conclusion may well be correct, there are obvious limits to the extent which 'common sense and experience'--insofar as this consists of knowledge beyond the scope of the record in a particular case--can substitute for proof at a criminal trial." Id. at 1382
 In United States v. Griffin, 525 F.2d 710 (1st Cir.1975), cert. denied, 424 U.S. 945, 96 S.Ct. 1414, 47 L.Ed.2d 351 (1976), the issue was whether the government had proven that defendant knew of the court order that he was charged with intentionally obstructing and impeding pursuant to 18 U.S.C. Sec. 1509. Defendant did not take the stand and there was no direct evidence of his actual knowledge. We held: "absent evidence from which to infer awareness of the order by the defendant, we must find that the government did not make out its case." Id. at 713.
 
 
 [35]
 The following cases have discussed various constitutional aspects of the Act: Dalia v. United States, 441 U.S. 238, 254-59, 99 S.Ct. 1682, 1691-1694, 60 L.Ed.2d 177 (1979); United States v. Bailey, 607 F.2d 237, 240-41 (9th Cir.1979), cert. denied, 445 U.S. 934, 100 S.Ct. 1327, 63 L.Ed.2d 769 (1980); United States v. Martin, 599 F.2d 880, 883-84 (9th Cir.1979); United States v. Frederickson, 581 F.2d 711, 713 (8th Cir.1978) (per curiam); United States v. Ford, 553 F.2d 146, 152-70 (D.C.Cir.1977); United States v. Agrusa, 541 F.2d 690, 696-98 (8th Cir.1976), cert. denied, 429 U.S. 1045, 97 S.Ct. 751, 50 L.Ed.2d 759 (1977); United States v. Feldman, 535 F.2d 1175, 1181 (9th Cir.), cert. denied, 429 U.S. 940, 97 S.Ct. 354, 50 L.Ed.2d 309 (1976); United States v. Kirk, 534 F.2d 1262, 1273 (8th Cir.1976), cert. denied, 430 U.S. 906, 97 S.Ct. 1174, 51 L.Ed.2d 581 (1977); United States v. Civella, 533 F.2d 1395, 1399 (8th Cir.1976), cert. denied, 430 U.S. 905, 97 S.Ct. 1174, 51 L.Ed.2d 581 (1977)
 
 
 [36]
 18 U.S.C. Sec. 2517(5) provides:
 (5) When an investigative or law enforcement officer, while engaged in intercepting wire or oral communications in the manner authorized herein, intercepts wire or oral communications relating to offenses other than those specified in the order of authorization or approval, the contents thereof, and evidence derived therefrom, may be disclosed or used as provided in subsections (1) and (2) of this section. Such contents and any evidence derived therefrom may be used under subsection (3) of this section when authorized or approved by a judge of competent jurisdiction where such judge finds on subsequent application that the contents were otherwise intercepted in accordance with the provisions of this chapter. Such application shall be made as soon as practicable.
 
 
 [37]
 18 U.S.C. Sec. 2517(3) provides:
 (3) Any person who has received, by any means authorized by this chapter, any information concerning a wire or oral communication, or evidence derived therefrom intercepted in accordance with the provisions of this chapter may disclose the contents of that communication or such derivative evidence while giving testimony under oath or affirmation in any proceeding held under the authority of the United States or of any State or political subdivision thereof.
 
 
 [38]
 Appellant has suggested no other violation of Sec. 2518
 
 
 [39]
 18 U.S.C. Sec. 1955 provides in relevant part:
 Sec. 1955. Prohibition of illegal gambling businesses
 (a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years, or both.
 (b) As used in this section--
 (1) "illegal gambling business" means a gambling business which--
 (i) is a violation of the law of a State or political subdivision in which it is conducted;
 (ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and
 (iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.
 (2) "gambling" includes but is not limited to pool-selling, bookmaking, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein.
 (3) "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.
 
 
 [40]
 18 U.S.C. Sec. 1084 provides in pertinent part:
 (a) Whoever being engaged in the business of betting or wagering knowingly uses a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest, or for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers, or for information assisting in the placing of bets or wagers, shall be fined not more than $10,000 or imprisoned not more than two years, or both.
 
 
 [41]
 The Second Circuit has held that the court authorization required by Sec. 2517(5) was implicitly obtained when the district judge approved continuation of the wiretap after being fully advised of the essential facts of the unspecified violation. United States v. Masciarelli, 558 F.2d 1064, 1069 (2d Cir.1977)
 
 
 [42]
 It is not clear from the appellant's brief whether he is raising a constitutional challenge to the use of the section 1955 violation evidence